case. Indeed, but for this, I do not see how the jury could have found for the defendants, as the integrity of the judgment was not assailed by a single witness, so far as I have observed, and I have read the testimony with some care. The testimony of both Schrank and Raisch, the parties to the judgment, fully sustains its consideration. The most that can be urged against it are some trifling contradictions in their testimony. Neither witness was impeached, or seriously contradicted.

We think it was error to call the attention of the jury to certain declarations of Raisch, made to various parties, as to his financial condition. That a defendant in a judgment cannot destroy it by his mere declarations is settled law. The latest case upon this subject is Unangst v. Goodyear Co., 141 Pa. 127, decided at the present term. The holder of a judgment would have a very precarious security, if his debtor could destroy it by his mere loose declarations. Aside from this, Raisch was not a party to this proceeding and was a competent witness. His declarations were not competent.

The plaintiff has no reason to complain of the rejection of the testimony of Valentine Wich. He was offered to prove the declarations of the plaintiff himself, and of Raisch. If such testimony were competent, the parties to a suit could manufacture evidence without limit. This does not require discussion.

> The judgment is reversed, and a venire facias de novo awarded.

---

## E. B. BEAUMONT v. WILKES-BARRE CITY.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS OF LUZERNE COUNTY.

Argued April 15, 1891—Decided May 4, 1891.

1. The city of Wilkes-Barre, not accepting the provisions of the act of May 23, 1874, P. L. 230, is governed, as to the grading, paving, etc., of streets and the collection of the cost thereof, by § 27, paragraph 6, of

Statement of Facts.

its incorporating act of May 4, 1871, P. L. 539; act of April 5, 1867. P. L. 841; and § 3, paragraphs VI.-IX., of the general borough act of April 3, 1851, P. L. 323.

2. Said act of April 5, 1867, authorizing the assessment of the cost of grading, paving, etc., of streets, against abutting properties according to the front width thereof, to the middle of every such street, is not in conflict with, nor, though a special act, is it repealed by § 1, article IX. of the constitution, providing for uniformity of taxation.

3. Notice to individuals affected, of a "proposition" to pave a street at their expense, and opportunity to be heard thereon before the council or a committee thereof, is a sufficient compliance with the statutory requirements, though given before a final ordinance designating the kind of paving and fixing the contract price has been perfected.

4. Where, after such notice, lotowners were heard upon the proposition to pave, by petition, remonstrance, and in person, the burden, in a bill in equity to invalidate an ordinance subsequently enacted and regular and legal on its face, is upon the plaintiffs to aver and prove the omission of any essential prerequisite in the antecedent proceedings.

5. Where a final ordinance for the paving, etc., enacted in 1876, was but the culmination of proceedings, first entertained in 1883 and at no time wholly abandoned, wherein individuals affected were heard and objected on other grounds, they are estopped from objecting that a notice of the "proposition" in April, 1884, was too remote.

6. The final ordinance cannot be held illegal because the lotowners did not have personal notice, at the time thereof, of proceedings to measure, value, map and schedule the properties liable to assessment, required by the act of May 1, 1876, P. L. 94, or that such proceedings did not precede the hearing on notice.

7. Under a provision of a city charter that all ordinances shall be recorded in a book to be provided for the purpose "and to be kept by the mayor," an ordinance, duly enacted, published and recorded, is not rendered invalid by reason of the fact that the book containing it was not kept at the mayor's office, but in the council chamber.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and WILLIAMS, JJ.

No. 144 January Term 1891, Sup. Ct.; court below, No. 7 October Term 1886, C. P. in Equity.

To the number and term of the court below, E. B. Beaumont, and a large number of others, for themselves and such other property owners and citizens as should desire to join, etc., filed a bill in equity against the city of Wilkes-Barre, praying, upon the facts relating to a certain assessment of the cost of the paving and curbing of Franklin street, therein averred, for an injunction restraining the defendant:

Statement of Facts.

1. " From collecting said tax or assessment from your orators.

2. " From enforcing the collection and payment of said tax or assessment against the properties of your orators, by municipal liens, actions of debt, or either.

3. " From enforcing the collection and payment of the twenty per centum penalty, for the refusal or neglect of your orators, for the period of thirty days, to pay any instalment of the assessment, as is provided in the alleged ordinance of February 2, 1886, hereinbefore set forth.

4. " From declaring due and immediately payable the whole assessment against your orators, by reason of your orators' neglect or refusal, for the period of thirty days, to pay any instalment, as is provided in the alleged ordinance of February 2, 1886, hereinbefore set forth."

11. " And that the proceedings of the city council of the city of Wilkes-Barre, whereby and whereunder the assessment of taxes is sought by the said city to be laid and enforced against your orators and their properties, be declared illegal and void."

A preliminary injunction was awarded and subsequently, on motion, continued.

An answer having been filed and issue joined, the cause was referred to *Mr. Chas. R. Buckalew*, as examiner and master, who on March 22, 1890, filed a report, wherein,—citing acts of assembly in force in Wilkes-Barre, to wit, paragraphs VI.–IX., § 3, of the general borough act of April 3, 1851, P. L. 323 ; act of March 23, 1865, P. L. 725 ; act of April 5, 1867, P. L. 841 ; §§ 9, 10, incorporating act of May 4, 1871, P. L. 539 ; act of May 1, 1876, P. L. 94, the master proceeded :

It has been claimed that Wilkes-Barre is subject to the city classification act of May 23, 1874, P. L. 230, but the claim must be rejected. Although the first section clearly includes her among cities of the third class, she has not accepted the act as provided for in the fifty-sixth, fifty-seventh and fifty-eighth sections, and therefore is not subject to its provisions : Reading City v. Savage, 124 Pa. 328. She is in a peculiar position among the populous towns of the state. She is not subject to new laws relating to boroughs, nor to special or local legislation in the future, because such legislation is forbidden to her by the seventh section of the third article of the constitution ; nor is she at present subject to the regulations for classified cities

provided by the act of 1874, and its proper supplements. The legislature may repeal the special acts which now apply to her, and even her charter as a city, but cannot by new affirmative enactments separate her from other cities of her own class, and extend to her privileges, or impose upon her duties which will not apply equally to them.

But the act of May 1, 1876, already cited, must be held to include her, although the word "councils," used in that act, properly applies only to a municipal legislature composed of two bodies or branches. All cities, except those of the first class, being expressly brought within the enactment, and the act relating to a subject-matter where classification is permissible, and the exclusion of Philadelphia free from objection, the act extends to Wilkes-Barre, as to all other cities of the second and third classes. Besides, it is to be noted that the act, by its title, is not a supplement to the act of 1874.

The special act of 1867, already given, is assailed by the plaintiffs upon several grounds. That it is unconstitutional, which is the main objection, must be because it was so when passed, or was made so by the constitution of 1874. That it was so originally, cannot be maintained, in view of the numerous authorities which have sustained the frontage rule of contributory assessment in the built-up parts of towns and cities. As to the operation or effect of the new constitution upon this and other like acts of prior enactment, it must be admitted that general laws to supply their place, and better designed to subserve public objects and preserve private rights, should have been passed by the legislature.

But the courts cannot enact statutes; they are compelled to deal with those which exist. Hence, the doctrine announced in Lehigh Iron Co. v. Lower Macungie Tp., 81 Pa. 482, and in other cases where legislation is required to execute the new constitution, old statutes which such legislation would supersede may continue to have effect until the new legislation is had. The limitations of this doctrine need not be here examined; it is sufficient to say that unless the act of 1867 is shown to be plainly inconsistent with some immediately operative provision of the constitution, or has been displaced by subsequent legislation, it stands upon the same ground with other borough laws relating to Wilkes-Barre, which the charter of

the city continued in force, and which are still operative as city laws.

Did the fourth division of the twenty-seventh section of the city charter, which authorizes the city authorities to regulate "the paving of such streets as may be deemed advisable," supply the place of the act of 1867, or repeal it by implication? The grant is in general terms and, upon an admissible interpretation of the word "regulate," might confer power upon the council to direct a street to be paved at the expense of the city, or of the property owners along it. But if this should be admitted, it would still remain true that the city could exercise the very power in question, as to the paving of Franklin street at the expense of the lotowners thereon. As, however, the collection remedies, contained in the act of 1867, are wanting in the city charter, the place of the former act would not be fully supplied; and, as repeals by implication are not favored in law, we must upon the whole conclude that the charter, upon any acceptable construction, does not repeal or displace the act of 1867.

—The master, considering certain resolutions and ordinances of council, and petitions and remonstrances of property owners, referred to in the opinion of the court below, infra, found as follows:

1. That the ordinance passed by the council of Wilkes-Barre, February 2, 1886, approved by the mayor on the fourth day of the same month, was passed irregularly and without the requisites required by law.

2. That the notice to lotowners of April 12, 1884, was not sufficient to charge the said lotowners with notice of the paving "proposition" contained in the city ordinance of February 2, 1886, and was not, with reference to that ordinance, a compliance with the eighth division, third section of the general borough act of April 3, 1851.

3. That in the absence of all proof in this case, that there was an actual hearing of lotowners by the street committee, on April 22, 1884, or that the street committee or a majority of them attended at the time and place appointed, or that said committee had any definite or formal pavement proposition to submit for the consideration of lotowners, the notice of April 12, 1884, did not confer authority upon the city council to pass

an ordinance for the paving of Franklin street, and said notice alone was not a compliance with the above-mentioned provision of the said borough act of 1851.

4. That if the said notice was sufficient to charge the lot-owners on Franklin street with knowledge of any proceedings by council, then or within a reasonable time to be taken for the paving of Franklin street, it would have no such effect nearly two years afterwards, under changed circumstances, as to the ordinance of February 2, 1886, and the proceedings connected therewith.

5. That the said notice of April 12, 1884, was premature, and ineffectual to validate or authorize a paving ordinance for Franklin street, inasmuch as no proposition in form for such improvement had been prepared by the council, or its street committee, or was then in preparation, and no survey of the lots on said street, or map, or valuation thereof, or estimate of the cost of the work, in any form, or of charges upon lotowners therefor, had been, or was about to be made.

6. That in the absence of any report by the street committee to council, of any meeting by them with lotowners on April 22, 1884, or at any other time, or of their own attendance at the time and place appointed for such meeting by the notice of April 12th, and in the absence of all proof in this suit of such attendance by them, or of any fact or circumstance relating to an actual hearing, the conclusive presumption against the city is that no hearing was had or afforded to the lotowners under the said notice of April 12th, and said notice wholly failed of its intended purpose.

7. That the ordinances and resolutions, passed by the council prior to 1886, being irregular and unauthorized and not recorded, published and kept pursuant to the city charter, the lotowners on Franklin street were under no legal obligation to respect them, or regard any notice, or request from the council, or the street committee, concerning or connected with them; and the same rule will apply to the ordinance of February 2, 1886, unless the legal prerequisites thereto were observed by council, and said lotowners were informed thereof.

8. That the ordinance of February 2, 1886, was irregular and unauthorized, because personal notice to and a hearing of the lotowners interested in relation thereto, was not afforded to

said lotowners before the ordinance was passed, pursuant to the eighth division, § 3, of the general borough act of April 3, 1851.

9. That the valuation of lots upon Franklin street by the street committee, directed by council resolution of December 1, 1885, was irregular and unauthorized, because no personal notice of said order of council was given to the lotowners, under the sixth division, § 3, borough act of 1851, and an opportunity given them to attend when their premises were viewed and valuations thereof made.

10. That the street committee's schedule of lot valuations on Franklin street and charges thereon, being made without notice to or knowledge by the lotowners interested therein, and no notice thereof, or hearing thereon, being afforded said lotowners, before the ordinance passed on February 2, 1886, the said schedule as attached to that ordinance was not authorized or lawful under the regulation act of 1876, and by reason thereof, the said ordinance was and is null and void.

11. That there was no acquiescence by lotowners on Franklin street in the action of council regarding the paving of that street and waiver by them of their legal rights in relation thereto, but, by remonstrance and by the bill in equity, No. 2 October Term 1885, council were fully warned that a majority in interest of said lotowners would be opposed to the action by them in adopting the ordinance of February 2, 1886.

12. That the ordinance and ordinance resolutions of the council of the city of Wilkes-Barre, relating to the paving of Franklin street, passed prior to February, 1886, were not recorded in the mayor's book, kept in the mayor's office and open to inspection as required by the ninth section of the city charter; and no such book was so kept prior to the year 1886. . .

—The master, therefore, reported that, in his opinion, the plaintiffs were entitled in law to relief; and recommended that their bill be sustained, and that their prayers for relief, numbered 1, 2, 3, 4 and 11, be granted, and a decree made accordingly, with allowance of costs.

To the report of the master, the plaintiffs filed exceptions alleging that the master erred inter alia :

1. In finding that the act of April 1, 1867, was constitutional.

2. In finding that said act had not been been annulled by the

constitution of 1874, and by the act of May 23, 1874, P. L. 230, and its supplements.

3. In not finding that the ordinance under which the assessments were laid was in conflict with § 9, article IX. of the constitution.

4. In not finding that the city of Wilkes-Barre was within the provisions of the act of May 23, 1874, P. L. 230, and its supplements.

The defendant, also, filed exceptions, alleging, inter alia, that the master erred:

14. In not finding and recommending that the plaintiffs' bill should be dismissed with costs.

Said exceptions having been overruled by the master, and renewed on the filing of his report, after argument thereof, the court, RICE, P. J., filed the following opinion:

This is a bill in equity in which the plaintiffs pray for a decree to restrain the city from collecting the assessments on their properties for the paving of Franklin street, between Union and Ross streets, and to declare that the ordinance under which the assessments were made is null and void. The master has recommended that these prayers of the bill be granted. After the dissolution of the preliminary injunction, most of the lotowners paid their assessments, and many of them formally withdrew from the suit. Whether those who have paid would be entitled to the equitable relief which the master recommends to be granted to the plaintiffs without discrimination, is a question, which, in one view of the case, would require serious consideration, but, in the view which we take of it, it will not become material.

The movement to pave Franklin street had its inception, according to the evidence before us, in 1883. In order to correctly understand what we shall hereafter say concerning the notice to lotowners of this proposition, it will be convenient to state, at the outset, the successive steps which led up to the final ordinance of February 2, 1886, under which the pavement was laid, and the action of lotowners concerning the same. Also, it will be convenient to state these in their chronological order, so that the relation of each to the other may more clearly appear; and this is our excuse for what might otherwise seem to be a useless repetition of what is fully stated in the master's report.

Opinion of Court below.

On February 6, 1883, the council passed a resolution direct-
ing notice to be given to lotowners of the determination of
council to pave the street and pay for the same by assessments
on abutting property. On March 6, 1883, a large number of
lotowners, among whom were many of the present plaintiffs,
responded in writing expressing a desire to have an asphalt
pavement, such as laid by the Barber Asphalt Company in
Washington. This was the kind subsequently laid. Whether
or not there was a response from the other lotowners does not
appear.

On March 4, 1884, the council passed a resolution referring
the propriety of paving the street with asphalt to the street
committee, and directing notice to be given lotowners of the
time and place of hearing. Pursuant to the above resolution,
a notice, dated April 12, 1884, and reading as follows was duly
served: "You are hereby notified to meet the street committee
at the city council room, on Tuesday, the twenty-second day
of April, 1884, at two o'clock, P. M., for the purpose of being
heard in relation to the paving with asphalt Franklin street
from the south side of Union street to the north side of Ross
street."

On December 2, 1884, an ordinance was introduced, entitled
"An Ordinance authorizing the paving with asphalt of Frank-
lin street from Union to Ross" (and several other streets)
"and the payment of the cost thereof by frontage assess-
ments." This ordinance was finally passed on February 3,
1885, and approved by the Mayor on February 5th.

On May 5, 1885, the council passed a resolution authorizing
the street committee to advertise for bids under the above or-
dinance, and on June 2, 1885, a resolution accepting the bid
of the Barber Asphalt Company, and directing the proper offi-
cers to execute a contract, was passed.

On July 7, 1885, a remonstrance was presented to council
signed by a large number of lotowners, including many of the
present plaintiffs, protesting against the paving of the street
at present, and setting forth their reasons.

On July 18, 1885, Judge WOODWARD made an order in
equity suit No. 2 October Term 1885, continuing a prelimi-
nary injunction restraining the city from proceeding in the
contract with the Barber Asphalt Company, upon the ground

Opinion of Court below.

that, being a foreign corporation and not having complied with the act of 1874, the contract was illegal: Atherton v. Wilkes-Barre, 3 Kulp 402.

Shortly after this order was made, namely, on July 23, 1885, the council passed a supplemental ordinance authorizing the street committee to advertise for bids, and the city officers to execute contracts for the work. The date is not given, but, probably about the time or shortly before the succeeding resolution was passed, there was presented to council or to the committee, a remonstrance signed by fifty-six lotowners, amongst whom were many of the present plaintiffs, protesting against a sheet-asphalt pavement and petitioning for a block-asphalt pavement. Some of the signers objected to any asphalt pavement, but preferred block to sheet.

On September 16, 1885, the council passed a resolution directing the law and ordinance committee and the city solicitor to report, at the next meeting, an ordinance for paving the street with asphalt block.

On September 19, 1885, there was presented a petition of forty-one signers stating that in the matter of the proposed paving of the street, they preferred sheet to block asphalt.

On October 6, 1885, the law and ordinance committee reported an ordinance to pave the street with block asphalt, and the proposed ordinance was read the first time, but no further action was ever taken on it.

On December 1, 1885, the council, by resolution, directed the city engineer and street committee to make the estimate and view the properties, etc., as required by the act of May 1, 1876, P. L. 94, and report at the next meeting.

The final ordinance, introduced and passed on February 2, 1886, after reciting most of the foregoing proceedings of council, and expressing an intention to complete and perfect them by a new ordinance, directed: (1) That the street be paved with asphalt; (2) that contracts be executed with the Barber Asphalt Company for the paving, and with R. C. Mitchell for the curbing, at the prices and upon the terms and conditions specified in their bids made pursuant to the supplemental ordinance of July 23, 1885; (3) that the expense of the pavement be assessed upon the abutting properties according to their frontage and that the assessments be paid in three instalments;

(4) that all ordinances or parts of ordinances inconsistent therewith be repealed.    The estimate, map, or plan, and schedule required by the act of 1876 were attached to the ordinance.

In addition to this documentary evidence, it appears from the oral testimony that property owners appeared before the council, on different occasions during the year 1885, to express their views concerning the pending proposition.

The pavement was laid in the summer of 1886, and in September, 1886, after its completion, this bill was filed and a motion for a preliminary injunction was made.    On the hearing of that motion the case was very fully presented and ably argued, and after giving it as thorough investigation as we were able, we concluded that the assessments were not illegal. The case is now before us upon final hearing, with a master's report adverse to our former conclusion upon a vital question, viz, whether the lotowners had due notice of, and opportunity to be heard on the proposition to lay the pavement.    Notwithstanding what we said in the opinion referred to, if this were a pure question of fact, depending upon the credibility of witnesses, we should hesitate to disturb the finding of the master, for, in that case, the weight to be given to the testimony would depend largely upon the appearance of the witnesses, their conduct, and the impressions created by their examination.    But, in this case, the question is a mixed one of law and fact, and no conflict of evidence or contradiction of witnesses is involved. Its decision depends almost wholly upon a true construction of certain statutes, and the inferences or deductions to be drawn from certain proved or admitted facts.    " The weight due to a master's or auditor's report depends on the matter in question. When he reports facts directly proved by the witnesses, we are accustomed to give his report great weight, because of his superior opportunities of judging of the credibility of the witnesses and the effect of their testimony.    But, when the fact is a deduction merely from other facts reported by him, his conclusion is simply a result of reasoning of which we are as competent to judge as he : " Phillips's App., 68 Pa. 130.    Hence, the finding of the master upon this question of notice, although entitled to very respectful consideration, not only upon general principles, but also because of his high character and distinguished ability, is not conclusive.

Opinion of Court below.

1. By the act of April 5, 1867, P. L. 841, power and authority were conferred upon the town council of the borough of Wilkes-Barre "to grade, pave or macadamize, in such manner as they deem proper, any street, court or alley of said borough, and upon completion thereof, to assess for contribution against the respective properties fronting or adjacent thereto, whether improved or unimproved, and the owners thereof, the pro rata cost and expense of said grading, paving, etc., in front of each respective lot or property, according to the front width thereof, to the middle of every such street, court or alley." This act became part of the law governing the city upon its incorporation in 1871, and is in force still. The city of Wilkes-Barre, never having accepted the provisions of the act regulating the government of cities, passed in 1874 and 1889, is not subject to the provisions of these acts relative to the passage of ordinances in general or paving ordinances in particular, but, as to the power and authority of its corporate officers and the mode of exercising the same, is governed by its own charter. This proposition was fully discussed in our former opinion, and at this time we simply refer to the cases of Phœnix v. Reynolds, 13 Phila. 522; Woodward v. Wilkes-Barre, 4 Kulp 125, and Reading City v. Savage, 124 Pa. 328.

2. [The act of 1867 does not conflict with § 1, article IX. of the constitution, which provides that "All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws;" and, although a special law, was not repealed thereby.] [10] The report of the master has left nothing to be added to what we have heretofore said in support of this proposition, except to refer to the recent case of Chester City v. Black, 132 Pa. 568, which conclusively decides it.

3. The evidence taken before the master shows, as we intimated in our former opinion, that this is the ordinary case of the first pavement of a street within the compactly-built part of the city, but having, it is true, here and there vacant lots abutting on it. The properties of the plaintiffs are in no sense of the term rural or suburban, and the allegation that the improvement does not confer peculiar or special benefits upon the properties assessed to pay the same, is not sustained by the

Opinion of Court below.

evidence and is negatived by the master's report. The fact that the lots abutting on Franklin street differ somewhat in depth and value, does not of itself render the assessment void because of inequality. We need not repeat what we have heretofore said upon this question, since the rule of law as above stated is positively declared in the case of Harrisburg v. McCormick, 129 Pa. 213, a case of as great hardship as that of any lotowner on this street. However much men may differ as to the perfect fairness of the frontage rule of assessment, there can be no doubt of its validity, under the decisions, or of the power of the city of Wilkes-Barre to apply it to the improvement of the street in question. Thus far, the findings of the master are affirmed, and the plaintiffs' exceptions thereto are overruled.

4. We now come to the question of notice under clause VIII., § 3, of the borough act of April 3, 1851, P. L. 320, which is conceded to be in force in the city of Wilkes-Barre; and we quote from our former opinion:

"The act of 1851 requires the corporate officers to give notice to all persons directly interested therein of any 'proposition' to fix or change the roads, streets, lanes or courts, or in the grading or other regulation thereof, and to designate the time and place when and where they shall be heard in relation thereto. The pavement of a street at the expense of the frontage owners was not directly before the mind of the legislature when this act was passed, for at that time the borough authorities had not such power; nevertheless, notice and an opportunity to be heard, in such a case, are required by principles of natural justice and are within the comprehensive terms and general purposes of the act."

Since the foregoing was written, the following language in the case of White v. McKeesport, 101 Pa. 394, has come to our attention: " The eighth clause of the third section of the general borough law, requiring notice to be given of a proposition to fix or change the roads, streets, etc., of a borough, is merely directory." If this be so, it may be fairly questioned whether, even conceding that due notice was not given to the property owners prior to the passage of the ordinance, the ordinance and the assessments made under it would be absolutely void. But see Hershberger v. Pittsburgh, 115 Pa. 78.

Opinion of Court below.

" That the plaintiffs had notice of the 'proposition' to pave
Franklin street with asphalt at their expense, is a fact about
which there can be no dispute. It is evidenced by the notice
requiring them to express their preference as to the kind of
pavement, by the notice to meet the street committee, on a day
named, for the purpose of being heard in relation to paving
the street with asphalt, and by their remonstrance against the
same presented to council in June, 1885."

The contrary is not alleged in the bill.

" The plaintiffs say that this was not a compliance with the
act, and insist that notice must be given after the introduction
into council of the specific ordinance under which the proposed
improvement is to be made. Such is not the letter of the act,
and we cannot agree that its purpose requires such a construc-
tion to be placed upon it. Before a complete ordinance for
the pavement of a street at the expense of the abutters can be
intelligently acted upon, many things must be taken into con-
sideration, requiring special investigation which the council as
a whole cannot well make. They must, in very many cases,
obtain information both as to the general proposition and as to
the details, through committees ; and unless the legislature has
expressly directed otherwise, a notice to appear before a com-
mittee to whom the matter has been referred, is equivalent to
notice to appear before the council, as for this purpose the
committee represents the council: Preble v. Portland, 45 Me.
241 ; 1 Dill. on Mun. Corp., § 227. Is it a local improvement
conferring special benefits upon the lots fronting thereon?
Should it be constructed at the present time? What kind of
pavement, under all the circumstances, should be selected?
All these are questions upon which the property owner has a
right to be heard, and concerning which it is important that
the council, acting through the medium of its committee, should
obtain as much and as early information as possible. No in-
flexible rule is prescribed for the city of Wilkes-Barre, under
which the introduction of a formal bill must precede the refer-
ence of a general proposition like this to the appropriate com-
mittee for investigation. For the sake of mere formality of
proceeding, this might be the better method ; but, so far as the
substantial purpose of notice and hearing is concerned, some-
thing can be said in favor of the hearing of the interested pro-

perty owners before the method and details of carrying out
the proposed improvement have been precisely formulated in
an ordinance. [At any rate, a certain latitude is allowable in
·this particular, under the terms of the act under consideration;
.all that it imperatively requires is notice and an opportunity to
be heard on the ' proposition,' which, after a careful considera-
tion of all the evidence, we think were given in the present
case.] [11]   [To state our conclusion in more definite terms, the
requirements of the act of 1851 were substantially complied
with by notice to the property owners of the proposition to
pave the street by assessments on abutting property, and by
giving them an opportunity to be heard upon that general
proposition, as well as upon the question of the kind of pave-
ment to be laid, although specific notices were not served on
them after the several formal ordinances were reported from
the appropriate committees."] [2]

The learned master, while not taking the extreme position
that an improvement ordinance in its perfected or final form is
to be submitted to the lotowners at the hearing contemplated
by the act of 1851, or that the hearing cannot be had before a
committee of the council, holds that the lotowners in this case
had not such notice and opportunity to be heard as were essen-
tial to the passage of a valid ordinance.

Speaking of the second notice, he says: [" Besides, the old
notice of April 12, 1884, was one of doubtful character. In
its form it was of uncertain purpose, judged in connection with
·the resolution of February 6, 1883, and the preference notice
·to which response had been made by lotowners in March of
·the same year." If by this is meant that a lotowner might
have treated the notice as a nullity, because of uncertainty
whether he would be heard in opposition to paving the street
at all, or against any kind of pavement, we must dissent from
the conclusion.] [3]   Judged by itself, its form is unobjectiona-
ble; and as no ordinance had been passed pursuant to the res-
olution and notice of February 6, 1883, the lotowners must be
presumed to have understood from the notice of April 12, 1884,
that the question of paving the street was still an open one,
and that they would be heard upon that question as well as
upon the question of the kind of pavement to be laid. That
is the understanding that any ordinary man would get from

the notice. Why surmise that some lotowner may have understood it differently?

[But, it is said the conclusive presumption is, that no hearing was had or afforded to lotowners under the notice of April 12, 1884. The fact that no written report was made to the council does not conclusively prove that the committee did not report verbally, and in that way give to the council the benefit of their investigations in the oral discussions which took place before that body; and, although that would be a grossly informal and unparliamentary method, we should hesitate to conclude that the irregularity would be such as to invalidate an ordinance subsequently passed, where the lotowners were heard by the council by petitions, remonstrances, and in some cases in person. Much less does it warrant the presumption that the committee did not meet at the time and place appointed.] [4] It is just as reasonable to presume that they met, and that none of the lotowners attended, or that none who attended offered any objections to the proposition, in which case a formal report would be unnecessary. [If presumptions are to be resorted to, it would seem more natural to presume that the committee did their duty.] [12] If they did not meet or did not accord to lotowners a hearing, it was a very easy matter to prove; but not a lotowner asserts the fact, so far as we can discover, after a very thorough examination of the testimony.

It is assumed that the burden of proof rests on the city. If this were a scire facias on a lien this might, to a certain extent, be true; but in a suit in equity to restrain the city from enforcing a lien for an improvement made pursuant to an ordinance perfectly valid on its face, it is not so. The plaintiffs allege that the ordinance is illegal and void, because certain legal prerequisites were not complied with. The bill does not aver that the lotowners did not have notice of the proposition and an opportunity to be heard, but that they did not have such notice *after* the introduction of the ordinance. We have endeavored to show that all that the act of 1851 requires, is notice of the proposition, and that this does not mean notice of the perfected ordinance. If this conclusion be correct, it is not clear that this part of the bill might not have been demurred to. Be that as it may, if the ordinance is to be declared void and its enforcement enjoined upon a ground not specifically

Opinion of Court below.

alleged in the bill, it was for the plaintiffs to show affirmative-
ly wherein the city council omitted any essential prerequisite,
not for the city to show that the antecedent proceedings were
regular in every particular.   This important distinction be-
tween a proceeding to enforce a lien in a court of law, and a
suit in equity to restrain legal proceedings upon a lien prima
facie valid, is to be observed, not only in determining where
the burden of proof lies, but also in determining, whether, even
conceding that the plaintiffs might have a valid legal defence
to an action at law, they have presented a case clearly entitling
them to the exercise of the extreme power of a court of equity :
See Pittsburgh's App., 118 Pa. 458.

It is further objected that the notice of April, 1884, was too
remote in point of time to affect the lotowners with notice of
an ordinance passed in February, 1886.   There would be force
in this objection, if there were nothing to connect the two.
We cannot agree, however, that they are to be treated as sep-
arate and independent propositions.   We think the irresistible
conclusion from the evidence is that the ordinance of February
2, 1886, was the culmination of proceedings in the council upon
the proposition to pave Franklin street with asphalt, which was
first entertained in February, 1883, and although at times held
in abeyance, was at no time wholly abandoned or permanently
arrested.   In arriving at this conclusion, we have not over-
looked the injunction granted in July, 1885, and the resolution
of September 16, 1885, relative to a block-asphalt pavement;
but, as we have already stated, the injunction went only to
the contract, not to the ordinance or proposition pursuant to
which it was made.   The resolution referred to could not have
misled any vigilant lotowner, for he must have known that the
entertainment of a proposition to pave the street with block
asphalt was not an abandonment of the proposition to pave
with sheet asphalt, and that directing the committee to report
an ordinance to pave the street with block asphalt did not bind
the council to the adoption of the ordinance when it should be
reported.

In view of the fact that paving with asphalt was an experi-
ment in the city of Wilkes-Barre, that it was expensive, and
that there was a wide diversity of opinion and lack of in-
formation, at the outset, as to its adaptability, the delay from

Opinion of Court below.

1884 until February, 1886, was not extraordinary. Instead of the fact being that the lotowners were prejudiced by want of notice of the pendency of the proposition, we think, as is very forcibly argued by the city solicitor, that the effect of the delay was to give greater publicity to it, and to afford them a more extended opportunity to express their views and exert their influence upon the council concerning it; and an examination of the proceedings heretofore referred to at length will show that they availed themselves of it. It is true, as the learned master suggests, that the remonstrances and suit in equity show that there were many lotowners who did not acquiesce in the proposed action of the city council, and their case is not like those which decide that a lotowner who has been instrumental in inducing the council to pass an ordinance and make an improvement of this kind, is estopped from denying the authority of the council: Bidwell v. Pittsburgh, 85 Pa. 412; McKnight v. Pittsburgh, 91 Pa. 273; Dewhurst v. Allegheny, 95 Pa. 437. Whether those who signed the petition of September 19, 1885, in favor of a sheet-asphalt pavement would be estopped, we need not now inquire. Conceding for present purposes that they stand on the same footing as those who continue to object, the very acts which are relied on as showing that the lotowners did not acquiesce in the action of the city council, show their actual knowledge that the proposition of which they had due formal notice in April, 1884, had not been abandoned, and that they opposed it during the year 1885, but upon other grounds than want of notice and opportunity to be heard. [ Having had actual knowledge of the pendency of the proposition, and having objected to it upon other grounds, we are of opinion that they are now estopped from objecting that the notice of April, 1884, was too remote in point of time. To say the least, they are not entitled to equitable relief.] [15] To adopt the language of the court in Pepper v. Philadelphia, 114 Pa. 96, "They did more than simply to protest; they gave many reasons, and will not now be permitted to set up a thing which was not mentioned until after the work was done." See also Edgewood Bor., 130 Pa. 348.

It is further contended that the ordinance is illegal and void: (a) Because the lotowners did not have personal notice of the view made by the street committee, under the act of May 1,

Opinion of Court below.

1876, and § 1 of the standing ordinance entitled "Assessments;" (b) because the assessments and view required by that act and ordinance were not made prior to the hearing of the lotowners. If the council had power to make the assessments for the proposed improvement on the basis of the valuations of the lots it would be highly important that the lotowners should be afforded an opportunity to be heard upon that question, but that is not this case.   [The report called for by the act of 1876 was not the assessment, and did not bind the lotowner.   It was for the information of the council, and the purpose of the valuation was to assist the council in forming a correct judgment as to the propriety of making the improvement at the expense of the frontage owners, and not to fix a basis for the assessments.] [16] Under the law they were to be made according to frontage; and such being the case, we cannot see how the lotowners were prejudiced by the failure to give them notice of the time when their lots would be measured and valued, it not being alleged or even intimated that they were over-valued, or that there was any mistake made as to the frontage.   If the measurements of the frontage were not correct, they will have an opportunity to show it on the trial of the scire facias : Pittsburgh v. Coursin, 74 Pa. 400 ; White v. McKeesport, 101 Pa. 394.

We agree with the learned master that the intention of the legislature was, not that the itemized estimate and the map of the engineer and the schedule of the lot valuations and the proposed charges thereon, should be made simply in order to be attached or fastened to an improvement ordinance when passed, and afterwards to remain on file for future reference or use. We must assume that this was one of the purposes, for the act says so, but it was not the only purpose.   In order to act intelligently upon a proposition of this kind, it is desirable, if not absolutely necessary, that the city council should have in some form the information which the schedules, estimate and valuations required by the act of 1876 would give.   Due deliberation and regard for the rights of those who are to bear the expense, would dictate to them the importance of obtaining such information either in detail, or substantially, even in the absence of a statute expressly requiring it; but, in order to make sure that it should be before them when the proposition should be finally acted upon, the legislature declared that the estimate,

Opinion of Court below.

map or plan and schedule should be made and attached to the
ordinance before its passage.   Compliance with the act made
it impossible for the council or any member thereof to be de-
ceived, for they had directly before them detailed information
of what the proposition was and what would be the effect of
their action upon it.   Thus construed, the act became an addi-
tional safeguard against hasty and inconsiderate action of the
council.   But, having complied with the act strictly and liter-
ally, we have no warrant for declaring the ordinance null and
void, upon any presumption that the council did not give to the
information thus acquired due consideration, especially as the
proposition had been the subject of discussion and active agita-
tion for at least two years before.

It is claimed, also, that without previous compliance with
the act of 1876 there could be no proper hearing of the lot-
owners.   If they had deemed this essential in order to enable
them to express an intelligent opinion upon the pending pro-
position, undoubtedly they would have included it in their
objections.   But they did not do so.   On the contrary, it is
evident that those who opposed the proposition did so with
full knowledge that it was proposed to pave the street with
asphalt, and to assess the cost upon their lots according to the
frontage rule.   This has already been shown.   It also appears
affirmatively from the remonstrance of July 7, 1885, that they
knew very nearly the cost per foot front.   The amount of each
one's assessment was a matter of the simplest calculation, and
the map and schedule would give them very little more infor-
mation.   Therefore, [even if they did not have sufficiently full
information in April, 1884, which does not affirmatively ap-
pear, they had full knowledge before the final ordinance was
passed, ] [17] and while they were actively objecting to the pro-
ceeding.   [But, leaving these facts out of view, we can find
nothing in the act of 1876 to warrant the conclusion that com-
pliance with its provisions must precede the hearing of the
property owners.] [18]   This might be desirable, but the act does
not make it essential, and we have no right, under the guise
of construction, to make it an additional prerequisite.

5. Section 9 of the city charter, act of May 4, 1871, P. L.
542, provides that " All ordinances, by-laws, rules and regula-
tions of said council shall be . . . . . published in one or more

Opinion of Court below.

newspapers of said city, and recorded within thirty days after the passing thereof, in a book to be provided for the purpose by said corporation and to be kept by the mayor, otherwise the same shall not be valid; nor shall any such ordinance, by-law, rule or regulation be in force until it shall be so recorded and published; and said book shall be kept for inspection, without charge, of all persons interested."

Speaking of this subject, the learned master says: "Nor was it until about the beginning of 1886 that any respect was paid to that provision of the city charter which requires that all ordinances, by-laws, rules and regulations of council shall be recorded in a book to be kept by the mayor of the city, open to public inspection." If this is an adequate statement of the facts, then the legal conclusion to be drawn is that all ordinances passed prior to 1886, are null and void. This proposition is so far-reaching as to require very careful consideration. The evidence shows that the city provided two books, one called the "Resolution Book," in which the resolutions were recorded, and the other called the "Ordinance Book," in which the ordinances were recorded. All the ordinances heretofore referred to as such were duly recorded in the latter book and published. Until about the beginning of the year 1886, the ordinance book was kept most of the time in the city office in the court house, where the council met and where the other books, records and documents of the city were kept, and, so far as appears, was always open to the inspection of the public and parties interested. The mayor had his office in the lock-up building on Butler alley, about eight hundred feet away. It does not distinctly appear when the practice of keeping the book at the city office originated, but we think a fair explanation of the reason for so keeping it will be found in the testimony of Mr. Deitrick, the present city clerk. We make a single quotation from his testimony: "Q. Now, to whom was the permission or consent given, to keep the ordinance book in the city office? A. The book was kept there by permission and consent of Mayor Broderick. Mayor Broderick had no safe in his office, he had nothing to keep the book in. Mayor Broderick was in the office several times during his term when Mr. Jones was clerk. I heard him say to Mr. Jones that he had no place to keep the book; and, while he knew that the

Opinion of Court below.

city charter provided that the book should be kept in his office, he said that as he had no safe Mr. Jones should keep the book there, and that as soon as he had a safe the book should be taken over, and it was done." It is fair to say that some of his former testimony upon this question does not so clearly show the permission or request of the mayor; [but, taking the competent testimony as a whole, the legitimate inference is that when the book was kept at the city office, it was with the consent, if not at the express request of the mayor. To all intents and purposes he *kept* the book at the city office for safety and without any detriment to the public.] [19]

The case of Rolland v. Commonwealth, 82 Pa. 306, construing the provision of the act of 1867, concerning the custody of the jury wheel and the keys, is somewhat analogous. The act of 1871 designates the custodian of the book, but does not designate the place where he shall keep it. Indeed, we can find no express provision in the act, relating to his having an office. [To declare that every ordinance passed during Mayor Broderick's term, 1880 to 1886, is void because he did not keep the book in which they were duly recorded, all the time or most of the time, at his *office*, would be to introduce something into the act which the legislature did not put there.] [20] Now that a safe has been provided for the mayor's office, we think he should keep the book there, and we understand this has been done since the beginning of 1886. We go further, and concede that, under existing circumstances, it is now a duty, which, if necessary, he might be compelled to perform by mandamus; but the law does not declare that the penalty for his failure to keep the book at a particular place shall be the nullification of the ordinances recorded in it, and duly published, and we do not think the legislature so intended.

We think we have discussed all of the questions raised by the exceptions which require particular notice; and, for the reasons above given, in connection with what we said in our former consideration of the case, the plaintiffs' exceptions are overruled, the defendant's fourteenth exception is sustained, and it is ordered and decreed that the bill be dismissed at the costs of the plaintiffs. [21]

—Thereupon, the plaintiffs took this appeal, specifying inter alia that the court erred:

Opinion of the Court.

1. In overruling plaintiffs' exceptions to the master's report.
2–4. In the portions of the opinion embraced in [ ] [2 to 4]
10–12. In the portions of the opinion embraced in [ ] [10 to 12]
15–20. In the portions of the opinion embraced in [ ] [15 to 20]
21. In the final decree dismissing the plaintiffs' bill.[21]

*Mr. Edmund G. Butler*, for the appellants.

Counsel cited: Orphan Asylum's App., 111 Pa. 135; Washington Ave., 69 Pa. 353; Seely v. Pittsburgh, 82 Pa. 360; Hammett v. Philadelphia, 65 Pa. 146; Pusey v. Allegheny, 98 Pa. 522; Lumber & Boom Co. v. Commonwealth, 100 Pa. 438; Minnig v. Railroad Co., 11 W. N. 297; Fox's App., 112 Pa. 337; Erie City v. Universalist Church, 105 Pa. 278; Pepper v. Philadelphia, 114 Pa. 96; Edgewood Bor., 130 Pa. 348.

*Mr. William S. McLean*, for the appellee.

Counsel cited: (1) Hammett v. Philadelphia, 65 Pa. 146; Williamsport v. Beck, 128 Pa. 147; Pennock v. Hoover, 5 R. 291; Northern Liberties v. Church, 13 Pa. 104; Philadelphia v. Wistar, 35 Pa. 457; Commonwealth v. Woods, 44 Pa. 113; Magee v. Commonwealth, 46 Pa. 358; Wray v. Mayor, 46 Pa. 365; Lehigh Iron Co. v. Macungie Tp., 81 Pa. 482; Erie Co. v. Erie City, 113 Pa. 367; Huidekoper v. Meadville, 83 Pa. 156; Chester City v. Black, 132 Pa. 571. (2) White v. McKeesport, 101 Pa. 394; Pittsburgh v. Coursin, 74 Pa. 400. (3, 4) Hershberger v. Pittsburgh, 115 Pa. 87; Reading City v. Savage, 120 Pa. 198.

Per Curiam:

The careful and elaborate opinion of the learned judge of the court below has spared us the necessity of discussing this case. We affirm the decree for the reasons given by him.

The appeal is dismissed, at the costs of the appellants.